# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MELISSA MCGRATH, NANCY HEISE, ANDREA AREVALO, CHRISTINE TZENG** and **ANNA SASAKI**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**FAY NUTRITION, LLC.,**<br><br>Defendant. | Case No. 1:25-cv-10343<br><br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Melissa McGrath, Nancy Heise, Andrea Arevalo, Christine Tzeng and Anna Sasaki (collectively, "Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against Defendant Fay Nutrition, LLC ("Fay" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents as to all other matters:

### I.      INTRODUCTION

1. Information concerning an individual's health is among the most sensitive, and closely guarded information in our society.

2. The unwanted disclosure of such information can be enormously harmful. It can result in discrimination in the workplace, and denial of insurance coverage. And, if people are unable to trust that their sensitive health information will be kept confidential, they are much less likely to seek medical care when they need it most.

1

3. Fay is a medical provider offering both telehealth and in-person appointments with registered dieticians and registered dietician nutritionists.[1] Fay offers its medical services in all fifty states and the District of Columbia, and boasts that it has "the largest network of dietitians in the country with over 1,000," allowing it to "giv[e] access to life-changing nutrition care to millions."[2] Through Fay's website – www.faynutrition.com – (the "Website"), patients can schedule, modify, and attend medical appointments with Fay's practitioners.

4. Unfortunately, unbeknownst to Plaintiffs and other visitors to Fay's website, Fay does not keep its patients' private personal and health information confidential. Instead, through the Website, Defendant collected and transmitted personally identifiable and sensitive health information pertaining to Plaintiffs and other patients' upcoming appointments, including the fact that the patient is scheduling an appointment with a dietician, the medical provider with whom the patient has scheduled an appointment, the patient's health insurance provider, the GPS coordinates of the patients' location with sufficient specificity to identify the patient's street address, and the specific medical issues for which the patient is seeking treatment (collectively, the "Sensitive Health Information"). This Sensitive Health Information was disclosed to unauthorized third parties, including Alphabet, Inc. ("Google"), Meta Platforms, Inc. ("Facebook"), LinkedIn Corporation ("LinkedIn") and ByteDance, Inc. ("TikTok" and together with Google, Facebook and LinkedIn, the "Tracking Tool Providers"), through the use of surreptitious online tracking tools without Plaintiffs' or other similarly situated patients' consent.

5. Online advertising giants, like the Tracking Tool Providers, compile as much information as possible about American consumers, including information relating to the most

---

[1] *Home Page*, FAY NUTRITION, https://www.faynutrition.com/ (last accessed Aug. 27, 2025); *FAQ*, FAY NUTRITION, https://www.faynutrition.com/get-your-price#faq (last accessed Aug. 27, 2025).

[2] *Id*.

private aspects of their lives, as fuel for their massive, targeted advertising enterprise. Thus, any information about a person captured by those online behemoths can be used to stream ads to that person.

6.      The Tracking Tool Providers offer website operators access to their proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, Google Tag Manager, Meta Business Suite, Facebook Ads, LinkedIn Marketing Solutions and TikTok Pixel (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage The Tracking Tool Providers' enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

7.      But, in exchange for access to these Business Tools, website operators install the Tracking Tool Providers' surveillance software on their website (the "Tracking Tools"), including "tracking pixels" ("Pixels") and third-party "cookies" that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that The Tracking Tool Providers use to identify that user, regardless of what computer or phone is used to access the website.  The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

8.      In essence, when website operators use the Business Tools, they choose to participate in the Tracking Tool Providers' mass surveillance network and, in turn, benefit from the Tracking Tool Providers' collection of user data at the expense of their customers' privacy.

9.      Defendant is one of the companies that have chosen to prioritize its marketing efforts and profits over its patients' privacy by installing the Tracking Tools on its website.

10.     Each of the Plaintiffs and Class Members used the Website and had their personal Sensitive Health Information tracked by Defendant using the Tracking Tools. However, Defendant *never* obtained authorization from Plaintiffs or Class Members to share their Sensitive Health Information with third parties. Therefore, at all relevant times, Plaintiffs and Class Members could not, and did not, provide informed consent for their Sensitive Health Information to be transmitted to the third parties, including to the largest advertiser and compiler of user information in the world.

11.     Health information is highly regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information to a third party, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[3] Accordingly, Defendant's disclosure of Plaintiffs' and Class Members' Sensitive Health Information constitutes a violation of HIPAA.

12.     As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages and (vii) continued and ongoing risk to their Sensitive Health Information.

---

[3] 18 U.S.C. § 1320d-(6).

4

13. Therefore, Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: Invasion of Privacy; Breach of Confidence; Breach of Fiduciary Duty; Negligence; Breach of Implied Contract; Unjust Enrichment; violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq.*; violations of the California Invasion of Privacy Act, Cal. Pen. Code § 360, *et seq.*; and violations of N.Y. Gen. Bus. Law § 349.

## II. PARTIES

*Plaintiff Andrea Arevalo*

14. Plaintiff Arevalo is a citizen of the State of California, residing in Alameda County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

15. In or around August of 2025, Plaintiff Arevalo utilized the Website on her personal electronic devices to schedule and attend an appointment with a Fay dietician.

16. Unbeknownst to Plaintiff Arevalo, the Website transmitted her Sensitive Health Information, including the fact that she was scheduling an appointment with a dietician, including the fact that she was scheduling an appointment with a dietician, the medical provider with whom she scheduled her appointment, her health insurance provider, the coordinates of her physical location with sufficient specificity to identify her actual address and the specific medical issues for which she sought treatment, to unauthorized third parties through the Tracking Tools.

17. Plaintiff Arevalo never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided through the Website.

18. On every occasion that she visited the Website, Plaintiff Arevalo possessed an account with Google, and she accessed the Website while logged into her Google account on the

same device. When registering for these accounts, Plaintiff was required to provide extensive PII to each Tracking Tool provider.

19. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff Arevalo immediately began seeing targeted online advertisements for nutrition-related products and services.

***Plaintiff Melissa McGrath***

20. Plaintiff McGrath is a citizen of the State of New York, residing in Dutchess County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

21. In or around July of 2025, Plaintiff McGrath utilized the Website on her personal electronic devices to schedule and attend an appointment with a Fay dietician.

22. Unbeknownst to Plaintiff McGrath, the Website transmitted her Sensitive Health Information, including the fact that she was scheduling an appointment with a dietician, including the fact that she was scheduling an appointment with a dietician, the medical provider with whom she scheduled her appointment, her health insurance provider, the coordinates of her physical location with sufficient specificity to identify her actual address and the specific medical issues for which she sought treatment, to unauthorized third parties through the Tracking Tools.

23. Plaintiff McGrath never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided through the Website.

24. On every occasion that she visited the Website, Plaintiff McGrath possessed accounts with Google, Facebook and TikTok, and she accessed the Website while logged into her

6

Google, Facebook and TikTok accounts on the same device. When registering for these accounts, Plaintiff was required to provide extensive PII to each Tracking Tool provider.

25. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff McGrath immediately began seeing targeted online advertisements for nutrition-related products and services.

**Plaintiff Nancy Heise**

26. Plaintiff Heise is a citizen of the State of Texas, residing in Brazos County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

27. In or around August of 2025, Plaintiff Heise utilized the Website on her personal electronic devices to schedule and attend an appointment with a Fay dietician.

28. Unbeknownst to Plaintiff Heise, the Website transmitted her Sensitive Health Information, including the fact that she was scheduling an appointment with a dietician, including the fact that she was scheduling an appointment with a dietician, the medical provider with whom she scheduled her appointment, her health insurance provider, the coordinates of her physical location with sufficient specificity to identify her actual address and the specific medical issues for which she sought treatment, to unauthorized third parties through the Tracking Tools.

29. Plaintiff Heise never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided through the Website.

30. On every occasion that she visited the Website, Plaintiff Heise possessed accounts with Google, Facebook and TikTok, and she accessed the Website while logged into her Google, Facebook and TikTok accounts on the same device. When registering for these accounts, Plaintiff was required to provide extensive PII to each Tracking Tool provider.

7

31. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff Heise immediately began seeing targeted online advertisements for nutrition-related products and services.

***Plaintiff Christine Tzeng***

32. Plaintiff Tzeng is a citizen of the State of California, residing in Los Angeles County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

33. In or around January of 2025, Plaintiff Tzeng utilized the Website on her personal electronic devices to schedule and attend an appointment with a Fay dietician.

34. Unbeknownst to Plaintiff Tzeng, the Website transmitted her Sensitive Health Information, including the fact that she was scheduling an appointment with a dietician, including the fact that she was scheduling an appointment with a dietician, the medical provider with whom she scheduled her appointment, her health insurance provider, the coordinates of her physical location with sufficient specificity to identify her actual address and the specific medical issues for which she sought treatment, to unauthorized third parties through the Tracking Tools.

35. Plaintiff Tzeng never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided through the Website.

36. On every occasion that she visited the Website, Plaintiff Tzeng maintained active Google, Facebook, TikTok, and LinkedIn accounts, and she accessed the Website while logged into her Google, Facebook, LinkedIn and TikTok accounts on the same device When registering for her Google, Facebook, TikTok, and LinkedIn accounts, each Third Party required that she provide her PII, including her full name, gender, date of birth, phone number, and/or email address.

8

37. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff Tzeng immediately began seeing targeted online advertisements for nutrition-related products and services.

***Plaintiff Anna Sasaki***

38. Plaintiff Sasaki is a citizen of the State of California, residing in Los Angeles County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

39. In or around August of 2025, Plaintiff Sasaki utilized the Website on her personal electronic devices to schedule and attend an appointment with a Fay dietician.

40. Unbeknownst to Plaintiff Sasaki, the Website transmitted her Sensitive Health Information, including the fact that she was scheduling an appointment with a dietician, the medical provider with whom she scheduled her appointment, her health insurance provider, the coordinates of her physical location with sufficient specificity to identify her actual address and the specific medical issues for which she sought treatment, to unauthorized third parties through the Tracking Tools.

41. Plaintiff Sasaki never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided through the Website.

42. On every occasion that she visited the Website, Plaintiff Sasaki possessed accounts with Google and Facebook, and she accessed the Website while logged into her Google and Facebook accounts on the same device.

9

43. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff Sasaki immediately began seeing targeted online advertisements for nutrition-related products and services.

***Defendant Fay Nutrition, LLC***

44. Fay is a limited liability corporation incorporated in the State of Illinois with its principal place of business at 111 North Avenue, Barrington, IL, in Lake County.

### III. JURISDICTION AND VENUE

45. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiffs and many putative class members are citizens of a different state than Defendant. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

46. This Court has personal jurisdiction over Defendant because Defendant has advertised and offered its Website and services to consumers in the State of Illinois and in this judicial district. Personal jurisdiction is also proper because Defendant is headquartered in this judicial district, and has otherwise made or established contacts in the State of Illinois and in this judicial district sufficient to permit the exercise of personal jurisdiction.

47. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.  DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### i.    The Tracking Tool Providers' Mass Advertising Surveillance Operations

48.    Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[4] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[5]

49.    Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[6] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[7]

50.    Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that: "[m]any websites and apps use Google services to improve

---

[4] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Aug. 27, 2025).

[5] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Aug. 27, 2025).

[6]    *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Aug. 27, 2025).

[7] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last accessed Aug. 27, 2025).

11

their content and keep it free. When they integrate our services, these sites and apps share information with Google."[8]

51.     Google also admits that it uses the information collected from third party websites, such as Defendant's, to sell targeted advertising, explaining to users that: "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[9]

52.     Facebook operates the world's largest social media company, and the vast majority of its revenue comes from selling advertising space on its platform. In 2021, Facebook generated $117 billion, roughly 97% of which was derived from the sale of digital advertisements.[10]

53.     Facebook markets its Business Tools to website operators, claiming that that its Business Tools can:

> [H]elp website owners and publishers, app developers, and business partners, including advertisers and others, integrate and share data with Meta, understand and measure their products and services, and better reach and serve people who use or might be interested in their products and services.[11]

54.     But, like with Google, website operators using Facebook's Business Tools must install Facebook's Tracking Tools on their website. Facebook readily admits that it "receives information from [third-party] businesses and organizations," such as Defendant, and uses that

---

[8] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last accessed Aug. 27, 2025).

[9] *Id.*

[10] *Meta Reports Fourth Quarter and Full Year 2021 Results*, META, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last accessed Aug. 27, 2025).

[11] *The Meta Business Tools*, FACEBOOK HELP CENTER, https://www.facebook.com/help/331509497253087?helpref=faq_content (last accessed Aug. 27, 2025).

information to sell targeted advertising.[12] By way of example, Facebook's online *Help Center* explains that users "may see [Facebook] ads for hotel deals if [they] visit travel websites."[13]

55.     TikTok is a social media company that allows users to share and watch short-term video content, subscribe to other TikTok users, and find videos and content creators relevant to their interests. While TikTok is a newer entrant to the online advertising industry, it has grown rapidly, with its global ad revenue estimated to surpass $32-billion this year.[14]

56.     Like Google and Facebook, TikTok admits that it will "match" the information collected through its Tracking Tools with "corresponding accounts on TikTok inventory to create a subset of matched IDs …and combine those Matched IDs with corresponding" data collected from other website operators and through its products.[15]

57.     LinkedIn markets itself as "the world's largest professional network on the internet[.]"[16] But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network.  LinkedIn has moved into the marketing and advertising space and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[17]  Recently, LinkedIn was projected as being responsible for

---

[12] *How Meta receives information from other business and organizations*, FACEBOOK HELP CENTER, https://www.facebook.com/help/2230503797265156/?helpref=related_articles (last accessed Aug. 27, 2025).

[13] *Id.*

[14] *Platform Insights: TikTok 2025*, WARC (Mar. 4, 2025), *available online at*: https://www.warc.com/content/paywall/article/Warc-Data/Platform_Insights_TikTok_2025/en-GB/159437?.

[15] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), *available online at*: https://ads.tiktok.com/i18n/official/policy/business-products-terms.

[16] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441.

[17] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

"roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[18]

58.     According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and ultimately, higher conversion rates."[19]  Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement.  To that end, LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[20]     LinkedIn's "marketing solutions allow advertisers to select specific characteristics to help them reach their ideal audience.  The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[21]

59.     As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[22]

---

[18] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

[19]   LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

[20] LINKEDIN, *supra* note 41.

[21]   LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[22]   *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

60.     The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, Predictive Audience, and LinkedIn Audience Network.[23]

61.     While the Tracking Tool Providers admit that they collect information from third-party websites through the Tracking Tools, none provides, nor could provide, a publicly available list of every webpage on which their Tracking Tools are installed. As such, the vague descriptions of the Tracking Tool Providers' data collection practices referenced above could not given Plaintiffs and Class Members any reason to think that Defendant was part of the Tracking Tool Providers' surveillance network. Moreover, as Defendant does not disclose its use of the Tracking Tools, Plaintiffs and Class Members could not have been reasonably expected to review any of the Tracking Tool Providers' privacy statements in connection with their use of the Website

62.     The Tracking Tool Providers aggregate the user information that they collect from third-party websites into 'advertising profiles' consisting of all of the data that they have collected about a given user.[24] With these advertising profiles, The Tracking Tool Providers can sell hyper-precise advertising services, allowing their clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or

---

[23] *See id.*

[24] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[25]

63. The surveillance of individual's internet usage through Tracking Tools is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google[, and] Facebook[.]"[26] Google trackers are present on 74-percent of all web traffic, and 16-percent of websites have a hidden Facebook tracking Pixel.[27]

64. Moreover, as in this case, the data collected through the Tracking Tools often pertains to the most personal and sensitive aspects of an individual's life. For example:

a. 93-percent of pornography websites allow third parties, including Google and Facebook, to collect their user's browsing habits.[28] In fact, Google advertising trackers were found on 73-percent of pornography websites.[29]

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[30]

---

[25] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics ((last accessed Aug. 27, 2025); *Facebook Ads: Who You Can Target*, SEOM Interactive, https://searchenginesmarketer.com/company/resources/facebook-ads-can-target/ ((last accessed Aug. 27, 2025); *About Ad Targeting in TikTok Ads Manager*, TIKTOK, https://ads.tiktok.com/help/article/ad-targeting?lang=en (last accessed Aug. 27, 2025).

[26] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Aug. 27, 2025).

[27] *WhoTracksMe*, Ghostery, https://www.ghostery.com/whotracksme/ (last accessed Aug. 27, 2025).

[28] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[29] *Id*.

[30] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

c. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[31] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google and Facebook.[32]

d. Thirty-three of the most popular crisis center websites provide information to Facebook through its Meta Pixel, including, in some cases, that users filled out a contact form or clicked a button to initiate a call to a suicide helpline.[33]

65. This monumental, invasive surveillance of Americans' internet usage is not accidental. As Google's then-CEO Eric Schmit admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[34] Likewise, in 2008, Facebook CEO Mark Zuckerberg predicted that the amount of information shared by individuals online will likely double every year, and Facebook's best strategy is to be "pushing that forward."[35]

---

[31] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed Aug. 27, 2025).

[32] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last accessed Aug. 27, 2025).

[33] Colin Lechner & Jon Keegan, *Suicide Hotlines Promise Anonymity. Dozens of Their Websites Send Sensitive Data to Facebook*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/13/suicide-hotlines-promise-anonymity-dozens-of-their-websites-send-sensitive-data-to-facebook (last accessed Aug. 27, 2025).

[34] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last accessed Aug. 27, 2025).

[35] Michael Zimmer, *Mark Zuckerberg's Theory of Privacy,* THE WASHINGTON POST (Feb. 4, 2014), https://www.washingtonpost.com/lifestyle/style/mark-zuckerbergs-theory-of-privacy/2014/02/03/2c1d780a-8cea-11e3-95dd-36ff657a4dae_story.html (last accessed Aug. 27, 2025).

66.     In fact, Google, Facebook and TikTok value user information so highly that they provide their Business Tools to many website operators for free, all to expand their surveillance apparatus.[36]

67.     When website operators, like Defendant, make use of the Tracking Tool Providers' Business Tools, they are essentially choosing to participate in the Tracking Tool Providers' mass surveillance network, and in return they benefit from the Tracking Tool Providers' collection of user data, at the expense of their website users' privacy. For example, in exchange for allowing it to collect user information, Facebook allows website operators to target customers with "dynamic advertisements" personalized to individual consumers using the user information that Facebook collects from all across the internet.[37] Likewise, Google rewards website operators for providing it with their user's information by granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[38] TikTok's advertising platform similarly allows website operators to retarget prior visitors, measure their ad performance, and analyze their website audience if the website operator installs the TikTok Pixel.[39] And LinkedIn provides website operators with access to its Predictive Audience, and LinkedIn Audience Network tools.[40]

---

[36] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ ((last accessed Aug. 27, 2025) ("Google Analytics gives you the tools, free of charge"); *Meta Business Suite FAQ*, META, https://www.facebook.com/business/tools/meta-business-suite/help (last accessed Aug. 27, 2025) ("Meta Business Suite is a free tool"); *Get started with the TikTok Pixel*, TIKTOK (Sep. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last accessed Aug. 27, 2025) ("Bonus: it's free").

[37] *Retargeting*, META, https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last accessed Aug. 27, 2025).

[38]     *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last accessed Aug. 27, 2025).

[39] *Get started with the TikTok Pixel*, TIKTOK (Sep. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last accessed Aug. 27, 2025).

[40] *See id.*

18

68.     In many cases, a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[41] Even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[42]

69.     Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[43]

### ii.     Pixels Can Record Almost Every Interaction Between a User and a Website

70.     In order to use the Tracking Tool Providers' Business Tools, Defendant installed the Tracking Tools, including tracking Pixels, onto its website.

71.     Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[44]

---

[41] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[42] *Id.*

[43] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POL. FOR THE INFO. SOC. (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

[44] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last accessed Aug. 27, 2025).

72. Pixels can collect a shocking amount of information regarding an individual's online behavior, including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the specific buttons and hyperlinks that the user clicks, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form.[45]

73. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[46]

### iii. The Pixels Installed on Defendant's Website Transmit Personally Identifiable Information to the Tracking Tool Providers

74. Every website is hosted by a computer "server" that holds the website's contents.

75. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as a computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

---

[45] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting ((last accessed Aug. 27, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last accessed Aug. 27, 2025).

[46] *Lurking Beneath the Surface, supra* note 35.

76.     Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

77.     Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[47] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[48] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[49]

78.     When a Google/Facebook/TikTok user logs onto their account, their web browser records a Google/Facebook tracking cookie.[50] These cookies include a specific line of code that links the web browser to the user's Google/Facebook/TikTok account.[51]

79.     The Tracking Tool Providers' Pixels use cookies, but operate differently than cookies.  Rather than directing the browser to save a file on the user's device, the Pixels acquires information from the browser, without notifying the user.  The information can include details

---

[47] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last accessed Aug. 27, 2025).

[48] *Id*.

[49] *Id*.

[50] Cyphers, *supra* note 16.

[51] *Id*.

about the user, his or her interactions with the Website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device).

80.     Simultaneously, the Tracking Tool Providers' Pixels, like those installed on Defendant's Website, request identifying information from any of the Tracking Tool Providers' cookies previously installed on the user's web browser.

81.     This user data is transmitted back to the Tracking Tool Providers contemporaneously as the user navigates the website. As a result, the Tracking Tool Providers can link all of the user information collected by their Pixels on the Defendant's Website to the user's identity, via the user's Google, TikTok, LinkedIn or Facebook profile.  Thus, even if a user never actually logs into a website, or fills out a form, the website, along with the Tracking Tool Providers, can know the user's identity.

82.     A remarkable number of Americans possess a Googe, Facebook, LinkedIn, or TikTok account. According to a 2023 survey, 68-percent of Americans report that they are users of Facebook.[52] One-third of Americans have accounts with Google's Gmail e-mail client, and over 80-percent of Americans use YouTube, Google's video client.[53] And, approximately one-third of

---

[52] Katherine Schaeffer, *5 facts about how Americans use Facebook, two decades after its launch*, PEW RESEARCH (Feb. 2, 2024), https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last accessed Aug. 27, 2025).

[53] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ ((last accessed Aug. 27, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Aug. 27, 2025); Jeffrey Gottfried, *Americans' Social Media Use*, PEW RESEARCH (Jan. 31, 2024), https://www.pewresearch.org/internet/2024/01/31/americans-social-media-use/ (last visited Aug. 27, 2025).

Americans report using TikTok.[54] When these users visit a website, like Defendant's, that utilizes Google, Facebook, LinkedIn and/or TikTok's Tracking Tools, any information collected by the Pixels can be linked to the user's identity through the Google, Facebook, LinkedIn and/or TikTok cookies installed on the user's web browser.

83.     However, it is not only the Tracking Tool Providers' account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, the Tracking Tool Providers utilize sophisticated data tracking methods to identify even those few users who do not have the Tracking Tool Providers account.

84.     The Tracking Tool Providers' Pixels, like those on Defendant's website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

85.     An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[55] By tracking this browser fingerprint, the Tracking Tool Providers are able to compile a user's activity across the internet.[56] And, as the Tracking Tool Providers continuously compile user data over time, their understanding of the user's browser fingerprint becomes more sophisticated such that they need only to collect a single piece of identifying information to identify the user linked to a browser fingerprint. Indeed,

---

[54]    Jeffrey Gottfried, *Americans' Social Media Use*, PEW RESEARCH (Jan. 31, 2024), https://www.pewresearch.org/internet/2024/01/31/americans-social-media-use/ (last visited Aug. 27, 2025).

[55] Cyphers, *supra* note 14.

[56] *Id*.

in 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[57]

### iv. Defendant Disclosed Plaintiffs' and Class Members' Sensitive Health Information to The Tracking Tool Providers.

86. To schedule, re-schedule or attend a telehealth appointment with Fay, Plaintiff and Class Members were required to use the Website.

87. Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Website to capture and transmit the Sensitive Health Information that they communicated to Defendant while scheduling, re-scheduling and attending their appointments to third parties, including The Tracking Tool Providers.

88. The following screenshots ("Figures 1-4") depict the network transmissions made by the Google. TikTok, LinkedIn and Facebook Tracking Tools installed on Fay's Website. The information provided in Figures 1-4 is exemplar information collected on the Website, and is not Plaintiffs' information, but the Tracking Tools installed on the Website collected the same or similar information about Plaintiffs. As Figures 1-4 show, when patients schedule an appointment on the Website, the Sensitive Health Information requested and contemporaneously transmitted to Google, TikTok, LinkedIn and Facebook by the Tracking Tools installed on the Website includes:

a. *To All of The Tracking Tool Providers*: the fact that the patient is scheduling an appointment with a Fay dietician;

b. *To Google and TikTok*: the state in which the patient is located (in this case, Washington State), the patient's insurance provider (in this case, United

---

[57] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

Healthcare), the GPS coordinates of the patient's precise location (in this case 48.7[XXXXX], -122.4[XXXXX]),[58] a "Dietician ID" number corresponding with the medical provider with whom the patient has scheduled an appointment,[59] and the specific medical conditions for which the patient is seeking treatment (in this case, Crohn's disease, diabetes, eating disorders, food allergies, high blood pressure, kidney disease, sports nutrition, and thyroid health); and

c. *To TikTok*: the name of the medical provider with whom the appointment has been scheduled (in this case, Joshua Pittman).

89.     Further, the information that was transmitted to The Tracking Tool Providers was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiffs to their identities. The following screenshots show that the Google Tracking Tools on the Website transmitted the identifier numbers attached to Google's 'cid,' cookie, which identifies the user's Google account; that the TikTok Tracking Tools on the on the Website transmitted the identifier numbers attached to TikTok's 'user' and 'csid' cookies, which identify the user's TikTok account; that the Facebook Tracking Tools on the on the Website transmitted the identifier numbers attached to Facebook's 'fbp' cookie, which identifies the user's Facebook account; and that the LinkedIn Tracking Tools transmitted the identifier numbers attached to LinkedIn's "LI" cookie, which identifies the user's LinkedIn account. Additionally, the Tracking Tools also transmitted a

---

[58] Coordinate values, such as those depicted in Figures 1 and 2, grow increasingly accurate with the number of decimal places included. Here, the coordinate values collected and transmitted by the Tracking Tools are extremely precise: six decimal places are sufficient to pinpoint the patient's location within *less than a foot*. *See Accuracy of Decimal Places in Latitude and Longitude Degrees*, GARMIN, *available online at:* support.garmin.com/en-US/?faq=hRMBoCTy5a7HqVkxukhHd8. Thus, to preserve the privacy of the demonstrative user, the last five digits of the coordinates depicted in Exs. 1-2 are redacted. Even so, the redacted coordinates depicted in Figures 1 and 2 are still sufficient to identify the user's city of residence.

[59] Anyone, including Google and TikTok, can identify any Fay dietician with their "Dietician ID" by navigating to "www.provider.faynutrition.com/appointments/embed_appt?dietitian_id=*[X]*" where "[X]" is the Dietician ID number.

host of other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.



*Figure 1. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when patients schedule an appointment.*

26



*Figure 2. Screenshot depicting back-end network traffic from the Website which shows information transmitted to TikTok when patients schedule an appointment.*



*Figure 3. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Facebook when patients schedule an appointment.*



*Figure 4. Screenshot depicting back-end network traffic from the Website which shows information transmitted to LinkedIN when patients schedule an appointment.*

90.     In their default state, the Tracking Tools record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an

28

advertisement, or viewing a webpage.[60] Defendant purposely configured the Tracking Tools on the Website to collect and transmit additional user data, including the patient's location, insurance provider, medical provider, and specific medical conditions.

## B. DEFENDANT DISCLOSED PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT

### a. Defendant failed to inform Plaintiffs and Class Members of its disclosure of Plaintiffs' and Class Members' Sensitive Health Information.

91. Fay *never* informed Plaintiffs or Class Members that it was sharing their Sensitive Health Information with third parties, including the Tracking Tool Providers.

92. By engaging in this improper sharing of information without Plaintiffs' and Class Members' consent, breached Plaintiffs' and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

93. Despite never telling users like Plaintiffs and Class Members, Defendant allowed third parties such as the Tracking Tool Providers to intercept Plaintiffs' and Class Members' Sensitive Health Information and use it for advertising purposes.

### ii. The Tracking Tools Used by Defendant Were Imperceptible to Plaintiffs and Class Members

94. The Tracking Tools installed on the Website were invisible to Plaintiffs and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiffs and Class Members, were unable to detect the Tracking Tools on the Website.

---

[60] *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069, (last visited on Mar. 25, 2025).

95. Plaintiffs and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

96. Plaintiffs and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

97. Because Plaintiffs and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Health Information would be collected and transmitted to The Tracking Tool Providers, they could not and did not consent to Defendant's conduct.

### C. DEFENDANT WAS ENRICHED BY THEIR DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES

#### i. Defendant Received Material Benefits in Exchange for Plaintiffs' Sensitive Health Information

98. As explained, *supra*, users of the Tracking Tool Providers' Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing the Tracking Tool Providers' Tracking Tools on its website.

99. Upon information and belief, Defendant, as a user of the Tracking Tool Providers' Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google, Facebook and TikTok to collect Plaintiffs' and Class Members' Sensitive Health Information.

#### ii. Plaintiffs' and Class Members' Data Had Financial Value

100. Moreover, Plaintiffs' and Class Members' Sensitive Health Information has value and Defendant's disclosure and interception of that Sensitive Health Information harmed Plaintiffs and the Class.

101.    According to Facebook's annual report, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[61]

102.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

103.    Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[62] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[63]

104.    Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

105.    The unauthorized disclosure of Plaintiffs' and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm including Plaintiffs and Class Members.

---

[61] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Mar. 7, 2025).

[62] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[63] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

### D. DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES HIPAA

106. The disclosure of Plaintiffs' and Class Members' Private Information via the Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[64]

107. The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") that is held or transmitted by a covered entity such as Defendant. These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's The Tracking Tool Providers account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes Personal Health Information ("PHI").[65]

108. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data key to operations.

109. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant

---

[64] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Mar. 7, 2025).

[65] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited Oct. 8, 2023) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

are simply *not* permitted to use tracking technology tools in a way that exposes patients' Private Information to any third party without express and informed consent.

110.    Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA* Covered *Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[66]

111.    Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[67]

112.    Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

113.    The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

114.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future

---

[66] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* HHS, *available online at*: https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html (emphasis added).

[67] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

115. Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "document[ed] the methods and results of the analysis that justify such determination.'" Or, (2), if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number, characteristic, or code," so that the entity does not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." C.F.R. § 160.514.

116. The HIPAA Privacy Rule requires any "covered entity"—which includes dieticians—to maintain appropriate safeguards to protect the privacy of protected health information, and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

117. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be Protected Health Information. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with

34

health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[68]

118. Consistent with this restriction, the HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[69]

119. Here, Defendant provided patient information to third parties in violation of the Privacy Rule.

120. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

121. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

   a. Failing to ensure the confidentiality and integrity of electronic PHI that

---

[68] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Mar. 7, 2025).

[69] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Mar. 7, 2025).

Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

e. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f. Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

g. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

122. In its Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructed in 2012:

Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at

a certain clinic, then this information would be PHI.[70]

123. In its Guidance regarding Marketing, HHS further instructed in 2003:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[71]

124. HHS has repeatedly instructed for years that patient status is protected by the HIPAA Privacy Rule:

   a. "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

   b. "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and

   c. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

125. In July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

---

[70] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* (Nov. 26, 2012) at 5, available online at: https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[71]*Marketing*, HHS, https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (April 3, 2003) (last visited Mar. 7, 2025).

The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

"When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app. In their letter, both agencies *reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties*. For example, the disclosure of such information could *reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.* [72]

126.    The FTC is unequivocal in its stance.  The FTC has specifically informed HIPAA

covered entities, like Defendant, that they should not use tracking technologies to collect

---

[72] FED. TRADE COMM'N, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Jul. 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (emphasis added).

sensitive health information and disclose it to third party advertising platforms without informed consent:

> The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce. This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.
>
> For instance, *BetterHelp*, *GoodRx*, and *Premom* make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.
>
> [I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act.[73]

127. Therefore, Defendant's conduct, as described herein, is directly contrary to federal law and the clear pronouncements by the FTC and HHS.

**E. THE CALIFORNIA INVASION OF PRIVACY ACT AND FEDERAL WIRETAP ACT**

128. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

129. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

---

[73] FED. TRADE COMM'N, COLLECTING, USING, OR SHARING CONSUMER HEALTH INFORMATION? LOOK TO HIPAA, THE FTC ACT, AND THE HEALTH BREACH NOTIFICATION RULE, https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach.

130. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

131. As part of CIPA, the California Legislature introduced § 631(a), which imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978). Specifically, CIPA § 631(a) prohibits any person or entity from:

a. "intentionally tap[ping], or mak[ing] any unauthorized connection . . . with any telegraph or telephone wire";

b. "willfully and without the consent of all parties to the communication . . . read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or

c. "us[ing], or attempt[ing] to use . . . any information so obtained."

132. CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

133. Individuals may bring an action against a violator of CIPA § 631 for $5,000 per violation. Cal. Penal Code § 637.3.

40

134. In a manner similar to CIPA, the Federal Wiretap Act (i.e., the "ECPA") creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[74]

135. Although the ECPA does not apply "where one parties to the communication has given consent[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[75]

### F. PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

136. At all times when Plaintiffs and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Health Information with third parties for a commercial purpose, unrelated to providing them with medical care.

137. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

138. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[76]

---

[74] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).

[75] 18 U.S.C. § 2511(d).

[76] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Mar. 7, 2025).

139. Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[77] And, in a study performed by the National Institutes of Health ("NIH"), nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[78]

140. Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiffs and Class Members.

## V.  TOLLING AND ESTOPPEL

141.  Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of the Tracking Tools onto the Website.

142. The Tracking Tools on the Website were and are invisible to the average website visitor.

143. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

144. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

145. Defendant had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to patients, including Plaintiffs and Class Members, that by scheduling appointments through the Website, Plaintiffs' and Class Members' Sensitive

---

[77] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[78] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

Health Information would be disclosed or released to unauthorized third parties, including The Tracking Tool Providers.

146. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' Sensitive Health Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its patients that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

147. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

148. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## VI.   CLASS ALLEGATIONS

149. This action is brought by the named Plaintiffs on their behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

150. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

**The Nationwide Class**

All natural persons who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google, TikTok, LinkedIn, Facebook, or any other unauthorized third party.

151. In addition to the claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of separate California, New York and Texas Subclasses, which are defined as follows:

**California Subclass**

All natural persons residing in the State of California who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google, TikTok, LinkedIn, Facebook, or any other unauthorized third party.

**New York Subclass**

All natural persons residing in the State of New York who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google, TikTok, LinkedIn, Facebook, or any other unauthorized third party.

**Texas Subclass**

All natural persons residing in the State of Texas who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google, TikTok, LinkedIn, Facebook, or any other unauthorized third party.

152. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

153. Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

154. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 10,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

155. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendant had a duty to protect the Sensitive Health Information of Plaintiffs and Class Members;

b) Whether Defendant had duties not to disclose the Sensitive Health Information of Plaintiffs and Class Members to unauthorized third parties;

c) Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

d) Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Sensitive Health Information was being disclosed without their consent;

e) Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Sensitive Health Information;

f) Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

g) Whether Defendant violated the statutes asserted as claims in this Complaint;

h) Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i) Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy policy practices; and

j) Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

156. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

157. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

158. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including The Tracking Tool Providers, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

159. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management

46

difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

160. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

161. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c) Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

162.     Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

**COUNT I**
**COMMON LAW INVASION OF PRIVACY**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, New York, and Texas Subclasses)***

163.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 162 as if fully set forth herein.

164.     Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, highly personal Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiffs' and Class Members' knowledge or consent.

165.     Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via the Website and the communications platforms and services therein.

166.     Plaintiffs and Class Members communicated Sensitive Health Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

167.     Defendant's interception and disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

168.     Plaintiffs and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure

48

to third parties.

169.  Defendant's disclosure and publicization of Plaintiffs' and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

170.  As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

171.  Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

172.  Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

173.  Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

174.  Plaintiffs also seek such other relief as the Court may deem just and proper.

<u>**COUNT II**</u>
**BREACH OF CONFIDENCE**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, New***
***York, and Texas Subclasses)***

175.  Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 174 as if fully set forth herein.

176.  Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential.

177.  Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on the Website.

178. Contrary to its duties as medical providers and its express promises of confidentiality, Defendant deployed the Tracking Technologies to disclose and transmit Plaintiffs' and Class Members' Sensitive Health Information and the contents of their communications exchanged with Defendant to third parties, including The Tracking Tool Providers.

179. Defendant's disclosures of Plaintiffs' and Class Members' Sensitive Health Information were made without their knowledge, consent or authorization, and were unprivileged.

180. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

181. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

    d. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

    e. Defendant eroded the essential confidential nature of the provider-patient relationship;

    f. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensating Plaintiffs and Class Members for the data;

    g. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

    h. Defendant's actions diminished the value of Plaintiffs' and Class Members' Sensitive Health Information, and

    i. Defendant's actions violated the property rights Plaintiffs and Class Members have in their Sensitive Health Information.

182. Plaintiffs and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent

50

violation. Plaintiffs are also entitled to punitive damages.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### *(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, New York, and Texas Subclasses)*

183. Plaintiffs repeat the allegations contained in paragraphs 1 through 182 as if fully set forth herein.

184. Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential, which creates a special relationship between Defendant and Plaintiff.

185. In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became guardians of Plaintiffs' and Class Members' Sensitive Health Information, Defendant became a fiduciary by its undertaking and guardianship of the Sensitive Health Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Sensitive Health Information; (2) to timely notify Plaintiffs and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and do store.

186. Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with its patients and former patients, in particular, to keep secure their Sensitive Health Information private.

187. Defendant breached its fiduciary duties to Plaintiffs and Class Members by disclosing their Sensitive Health Information to unauthorized third parties, and separately, by failing to notify Plaintiffs and Class Members of this fact.

188. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be

proven at trial.

## COUNT IV
## NEGLIGENCE
### (On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, New York, and Texas Subclasses)

189.    Plaintiffs repeat and reallege the allegations contained in in paragraphs 1 through 188 as if fully set forth herein.

190.    Through their use of the Website, Plaintiffs and Class Members provided Defendant with their Sensitive Health Information, believing such Information would be kept confidential.

191.    By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

192.    Defendant negligently failed to take reasonable steps to protect Plaintiffs' and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to The Tracking Tool Providers.

193.    Defendant further negligently omitted to inform Plaintiffs and the Class that it would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

194.    Defendant knew, or reasonably should have known, that Plaintiffs and the Class would not have provided their Sensitive Health Information to Defendant had they known that Defendant intended to use that Information for unlawful purposes.

195.    Defendant's conduct has caused Plaintiffs and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

196.    Plaintiffs and Class Members are entitled to compensatory, nominal, and/or

punitive damages.

197.    Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, New York, and Texas Subclasses)***

198.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 197 as if fully set forth herein.

199.    When Plaintiffs and Class Members provided their Sensitive Health Information to Defendant in exchange for medical services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose the Sensitive Health Information without consent.

200.    Plaintiffs and Class Members accepted Defendant's offers and provided their Sensitive Health Information to Defendant.

201.    Plaintiffs and Class Members would not have entrusted Defendant with their Sensitive Health Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Sensitive Health Information without consent.

202.    Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Sensitive Health Information to third parties like The Tracking Tool Providers.

203.    As a direct and proximate result of Defendant's breaches of these implied contracts,

53

Plaintiffs and Class Members sustained damages as alleged herein.

204. Plaintiffs and Class Members would not have used Defendant's services, or would have paid substantially less for those services, had they known their Sensitive Health Information would be disclosed.

205. Plaintiffs and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

**COUNT VI**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, New York, and Texas Subclasses)***

206. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 205 as if fully set forth herein.

207. Plaintiffs plead this claim in the alternative to their breach of implied contract claim.

208. Plaintiffs and Class Members conferred a monetary benefit on Defendant in exchange for healthcare services. Specifically, they provided their Sensitive Health Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, *supra*.

209. Defendant knew that Plaintiffs and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive Health Information of Plaintiffs and Class Members by exchanging it for marketing and advertising services.

210. In particular, Defendant enriched itself by obtaining the inherent value of Plaintiffs' and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiffs' and Class Members' Sensitive Health Information.

211. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of its patients' Sensitive Health Information.

212. Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiffs' and Class Members' Sensitive Health Information.

213. If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendant.

214. Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of direct money damages.

215. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury.

216. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## COUNT VII
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*
Unauthorized Interception, Use, and Disclosure
*(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California, New York, and Texas Subclasses)***

217. Plaintiffs repeat and reallege the allegations contained in the paragraphs 1 through 216 as if fully set forth herein.

55

218. The ECPA protects both sending and receipt of communications.

219. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

220. The transmissions of Plaintiffs' Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

221. Electronic Communications. The transmission of Sensitive Health Information between Plaintiffs and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

222. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

223. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

224. Electronical, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs' and Class Members' browsers;

b. Plaintiffs' and Class Members' computing devices;

c. Defendant's web-servers; and

d. The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

225. By utilizing and embedding the Pixels on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

226. Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to third parties such as The Tracking Tool Providers.

227. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their Sensitive Health Information, including the reasons for their appointment, the dates of their appointment, the location of their appointment, and the identity and geographical location of the treating dietician.

228. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

229. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

230. Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious

57

act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

231. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

232. Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Sensitive Health Information does not qualify for the party exemption.

233. Defendant's acquisition of sensitive communications that were used and disclosed to The Tracking Tool Providers was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

    a. Invasion of privacy;

    b. Breach of confidence;

    c. Breach of fiduciary duty;

    d. Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3);

    e. Violations of the California Invasion of Privacy Act, Cal. Pen. Code. § 630., *et seq.*; and

    f. Violations of N.Y. Gen. Bus. Law § 349.

234. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiffs and Class Members, without user authorization; and disclosed individually identifiable Sensitive Health Information to The Tracking Tool Providers without user authorization.

235. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Sensitive Health Information on the Website, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' Private Information with The Tracking Tool Providers and other third-parties that (a) did not participate in these communications, (b) Plaintiffs and Class Members did not know were receiving their Sensitive Health Information, and (c) Plaintiffs and Class Members did not consent to receive their Sensitive Health Information.

236. As such, Defendant cannot viably claim any exception to ECPA liability.

237. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant have intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiffs or Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' Sensitive Health Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiffs or Class Members;

d. Defendant failed to provide Plaintiffs and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e. The diminution in value of Plaintiffs' and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiffs and Class Members intended to remain private, no longer private.

59

238.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiffs' and Class Members' Sensitive Health Information for financial gain.

239.    Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

240.    Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

241.    Any purported consent that Defendant may claim it received from Plaintiffs and Class Members was not valid.

242.    In sending and acquiring the content of Plaintiffs' and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

243.    As a result of Defendant's violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT VIII
## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")
### Cal. Pen. Code § 360, *et seq.*
### (*On Behalf of Plaintiffs Arevalo, Tzeng and Sasaki, and the California Subclass*)

244.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 243 as if fully set forth herein.

245.    The California Legislature enacted CIPA in response to "advances in science and technology" that "have led to the development of new devices and techniques for the purpose of

60

eavesdropping upon private communications[,]" recognizing that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code. § 630.

246. Under CIPA, it is unlawful to:

a. "[W]illfully and *without the consent of all parties to the communication*, or in any unauthorized manner, read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state;" or

b. "[U]se, or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained[;]" or

c. [A]id, agree[] with, employ[], or conspire[] with any person or persons to unlawfully do, or permit, or cause to be done any of the acts [prohibited by CIPA.]"

Cal. Penal Code § 631(a) (emphasis added).

247. At all relevant times, Defendant aided, employed, agreed with, and conspired with The Tracking Tool Providers, and likely other third parties, to track and intercept Plaintiff Arevalo's, Plaintiff Tzeng's, Plaintiff Sasaki's and California Subclass Members' internet communications while using the Website, specifically by installing and configuring the Tracking Tools to permit The Tracking Tool Providers to eavesdrop on and intercept in real-time the content of intercept Plaintiff Arevalo's, Plaintiff Tzeng's, Plaintiff Sasaki's and California Subclass Members' private communications with Defendant.

248. The content of those conversations included Sensitive Health Information. Through Defendant's installation and configuration of the Tracking Tools on the Website, these communications were intercepted by The Tracking Tool Providers during the communications and

61

without the knowledge, authorization, or consent of Plaintiff Arevalo, Plaintiff Tzeng, and California Subclass Members.

249. Defendant intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiff Arevalo, Plaintiff Tzeng, and California Subclass Members, transmitted the substance of their confidential communications with Defendant to third parties.

250. Defendant willingly facilitated the Tracking Tool Providers' interception and collection of Plaintiff Arevalo's, Plaintiff Tzeng's, Plaintiff Sasaki's and California Subclass Members' Sensitive Health Information by embedding the Tracking Tools on the Website, thereby assisting The Tracking Tool Providers' eavesdropping.

251. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Tools falls under the broad catch-all category of "any other manner":

    a. The computer codes and programs The Tracking Tool Providers and other third parties used to track and intercept Plaintiff Arevalo's, Plaintiff Tzeng's, Plaintiff Sasaki's and California Subclass Members' communications while they were navigating the Website;

    b. Plaintiff Arevalo's, Plaintiff Tzeng's, Plaintiff Sasaki's and California Subclass Members' internet browsers;

    c. Plaintiff Arevalo's, Plaintiff Tzeng's, Plaintiff Sasaki's and California Subclass Members' computing and mobile devices;

    d. The Tracking Tool Providers' web and ad servers;

    e. The web and ad servers from which The Tracking Tool Providers and other third parties tracked and intercepted Plaintiff Arevalo's, Plaintiff Tzeng's, Plaintiff Sasaki's and California Subclass Members' communications while they were using a web browser to access or navigate the Website; and

    f. The computer codes and programs used by The Tracking Tool Providers and other third parties to effectuate their tracking and interception of Plaintiff

Arevalo's, Plaintiff Tzeng's, Plaintiff Sasaki's and California Subclass Members' communications while they were using a browser to visit the Website.

252. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties, including The Tracking Tool Providers (and their agents, employees, and contractors) to receive Plaintiff Arevalo's, Plaintiff Tzeng's, Plaintiff Sasaki's and California Subclass Members' Sensitive Health Information in real time through the Website without their consent

253. By disclosing Plaintiff Arevalo's, Plaintiff Tzeng's, Plaintiff Sasaki's and California Subclass Members' Sensitive Health Information, Defendant violated Plaintiff Arevalo's, Plaintiff Tzeng's, Plaintiff Sasaki's and California Subclass Members' statutorily protected right to privacy.

254. As a result of Defendant's violation of the CIPA, Plaintiff Arevalo, Plaintiff Tzeng, and California Subclass Members are entitled to treble actual damages related to their loss of privacy in an amount to be determined at trial, statutory damages, attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages.

## COUNT IX
### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### N.Y. Gen. Bus. Law § 349 ("§ 349")
### (*On Behalf of Plaintiff McGrath and the New York Subclass*)

255. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 254 as if fully set forth herein.

256. § 349 prohibits the commission of "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."

257. Defendant violated § 349 by:

   a. Using the Tracking Technologies to record the sensitive communications made by and to Plaintiff McGrath and New York Subclass Members through the

63

Website with third parties, including The Tracking Tool Providers, without their knowledge or consent;

b. Transmitting the sensitive communications made by and to Plaintiff McGrath and New York Subclass Members through the Website with third parties, including The Tracking Tool Providers, without their knowledge or consent; and,

c. Disclosing the sensitive communications made by and to Plaintiff McGrath and New York Subclass Members through the Website to third parties, including The Tracking Tool Providers, in exchange for marketing and advertising services.

258. Defendant intended to mislead Plaintiff McGrath and New York Subclass Members and intended to induce Plaintiff McGrath and New York Subclass Members to rely on its misrepresentations and omissions.

259. Accordingly, Plaintiff McGrath and New York Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, treble damages, and attorneys' fees, filing fees, and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and other Class Members, pray for judgment against Defendant as follows:

A. an Order certifying the Nationwide Class, and California, New York and Texas Subclasses, and appointing the Plaintiffs and their Counsel to represent the Classes;

B. equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiffs and Class Members;

C. injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

64

D.      an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.      an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.      prejudgment interest on all amounts awarded and

G.      all such other and further relief as this Court may deem just and proper.

Dated: February 11, 2026                                Respectfully submitted,

                                                        */s/ Sonjay C. Singh*
                                                        Sonjay C. Singh (*pro hac vice*)
                                                        Mason A. Barney
                                                        **SIRI & GLIMSTAD LLP**
                                                        745 Fifth Avenue, Suite 500
                                                        New York, New York 10151
                                                        Tel: (212) 532-1091
                                                        E: ssingh@sirillp.com


                                                        **BURSOR & FISHER, P.A.**
                                                        Alec M. Leslie
                                                        1330 Avenue of the Americas, 32nd Floor
                                                        New York, NY 10019
                                                        Telephone: (646) 837-7150
                                                        Facsimile: (212) 989-9163
                                                        Email: aleslie@bursor.com

                                                        **BURSOR & FISHER, P.A.**
                                                        Stephen A. Beck
                                                        701 Brickell Avenue, Suite 2100
                                                        Miami, FL 33133
                                                        Telephone: (305) 330-5512
                                                        Facsimile: (305) 679-9006
                                                        Email: sbeck@bursor.com


                                                        *Counsel for Plaintiffs*

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: February 11, 2026

Respectfully submitted,

*/s/ Sonjay C. Singh*
Sonjay C. Singh